## FALLON v. HOUSTON OIL FIELD MATERIAL CO.

### No. 2919.

District Court, W. D. Louisiana, Shreveport Division.

June 9, 1939.

48

Wilkinson, Lewis & Wilkinson and John T. Guyton, all of Shreveport, La., for plaintiff.

E. W. & P. N. Browne, of Shreveport, La., and Wood & Morrow, of Houston, Tex., for defendant.

PORTERIE, District Judge.

This is an action ex delicto, or in tort brought by the plaintiff for the recovery of damages alleged to have been caused through negligence of the defendant in connection with work being done on a well being drilled in search of oil or gas.

Plaintiff alleges that he entered into a contract with the defendant, Houston Oil Field Material Company, whereby said company agreed to take charge of and superintend the setting of a Baker Cement Retainer in the well being drilled in search of oil or gas, and to take charge of and superintend the freeing of and recovery of the setting tool from the cement retainer after same had been set in the well at a depth of 4,920 feet.

Plaintiff contends that defendant, through its agent and employee, A. B. Cannon, was negligent in the performance of the contract in question, in that the said A. B. Cannon, as the agent and employee of defendant company, failed through carelessness on his part to release the setting tool from the cement retainer, and that the said Cannon issued orders and instructions to workmen on said well to pull the tubing and setting tool out of the hole, and that, on account of the fact that the setting tool was not released from the cement retainer which was cemented in the bottom of the well, the strain on the tubing caused same to break or part at a tubing collar approximately 400 feet from the top of the hole, with the result that the remainder of the string of tubing was left in the hole.

Plaintiff alleges that he has used diligent efforts to recover the tubing left in the hole, and clean out same, but that he has been unsuccessful, and, therefore, seeks as damages in this suit an amount sufficient to enable petitioner to drill another well to the depth where the cement retainer was set by defendant.

The negligence complained of on the part of A. B. Cannon, as the agent and employee of defendant, is that the said Cannon failed to rotate the tubing in the well in a proper manner and a sufficient number of times to release the setting tool from the Baker Cement Retainer which had been cemented at a depth of 4,920 feet.

In answer to plaintiff's contentions, defendant denies that there was any contract entered into by plaintiff and defendant. Defendant admits that Cannon "* * * did superintend the setting of a Baker Cement Retainer * * *" but denies that he was acting in pursuance of any contract.

Defendant further set forth in its answer that, if the Court should hold that there was any contractual relationship between plaintiff and defendant, it denies that its agents or employees were in any way guilty of negligence or fault, and defendant avers that the damage complained of was caused by several things, namely

(a) That the plaintiff, his agents or employees used defective pipe and tubing in said well;

(b) That plaintiff, his agents and employees used what is known as "Quick-Set" cement in the setting of said retainer instead of slow-set or other cement of a similar character;

(c) That plaintiff retained general control over the operations of said retainer and well, and refused to allow the said Cannon to have complete charge of same;

(d) That plaintiff, his agents and employees refused to "pull" the tubing when it was ascertained that same was defective;

(e) That plaintiff, his agents and employees, after having knowledge that the liquid or cement being pumped into the said well through the said tubing was showing up in the wrong casing, refused to pull said tubing at the request of the said Cannon before it was too late to do so;

(f) That the tubing and material was in such bad condition that it was not fit for use for the purpose for which plaintiff was using it, which fact was known to plaintiff,

his agents and employees, or should have been so known to them; and that all of said acts or any of them, on the part of the said plaintiff, his agents or employees, constituted negligence on its part in the said operations, and constituted the proximate cause or causes of the parting of said tubing;

(g) That plaintiff, his agents and employees at the time of the said operation in the course of setting the Baker Cement Retainer were repeatedly advised against proceeding with such operation in view of the defective tubing and pipe and the improper type of cement being used, so that such conditions could be remedied if possible, all of which was done without avail.

Defendant further defends this suit on the ground that defendant is not legally liable for any negligence on its part, by reason of the general custom prevailing in the industry to the effect that those engaged in the character of work involved herein assume no responsibility for damages or losses of any kind occasioned by the use of tools in such work, and also defendant relies upon an alleged stipulation by plaintiff against liability on defendant's part.

Testimony of witnesses, and exhibits offered, brought out the following facts: On July 16, 1936, according to the log in evidence, Long & Wolfe, drilling contractors, commenced drilling operations for the drilling of a well for the plaintiff in the southern part of Caddo Parish, at Robson, Louisiana, which was known as Cupples No. 1. The well was abandoned at 4,002 feet, but Mr. Roger Wolfe, of Long & Wolfe, stated that he intended to complete the well to a depth of 5,000 feet at a later date. In the spring of 1937 such arrangements were made with the same drillers and the well was drilled to a total depth of 5,675 feet, with 5½" casing being set at 5,000 feet. It was completed on April 10, 1937, and (according to the drillers' log) was again abandoned. The last operations were under the entire charge of E. S. White, a geologist—W. J. Fallon, the owner, remaining in New York.

In the course of the operations from 4,000 feet down, the usual cores were taken and drill stem tests were made, and samples of formations were furnished to the Arkansas Natural Gas Company and the Gulf Refining Company. Mr. Roger Wolfe, the driller, had found no pay oil or gas sand, and testified that when he moved off after completion of the well he considered it a dry hole, or a non-producer. Two geologists, called as witnesses, who were familiar with the structure and formation of the area on which the well was drilled, were of the opinion that there was no oil there in paying quantities and that the area was condemned.

After Long & Wolfe moved off, E. S. White stated that he decided to go back into the well and make a test of a "section of the porous material" from around 4,878 to 4,890 feet. His testimony was to the effect that in making this test the operators put in 100 sacks of cement in setting the 5½" casing; that after the cement had set they went in with a gun perforator and found the plug which had been pumped down on top of the cement at the time the job was previously cemented was up to 4,200 feet; they believed there was probably a hole in the 5½" casing at that depth which had allowed the pressure originally placed on the cement plug to come back up to that point, which hole had to be plugged with cement before they could make a test of the formation between 4,878 and 4,890.

His testimony continued as follows: that in order to cement this split in the casing at 4,200 feet they decided to secure a Baker Cement Retainer so they could pump cement through the retainer and down through the 5½" casing, allow the cement to come back up from the outside of the casing and back through the split and thus cement this hole, and that this was necessary before he could test the formation.

White then stated that he made an oral contract for the purchase of a Baker Cement Retainer with the Houston Oil Field Material Company by telephone at McLeod in the Rodessa Oil Field, in that he talked with someone in Houston.

In due course the retainer was delivered, and A. B. Cannon was sent to White as a service man to assist in setting the Baker Cement Retainer. White also engaged two other crews for the cementing of the hole in the casing, namely, Halliburton Cement Company crew, who performed the cement work, and Earl Carter and crew, who furnished machinery and power for hoisting, etc. From the testimony and contract in evidence, this work of cementing the well was begun on July 9, 1937, and continued to July 12, 1937, when the work was completed and White gave a check to Cannon, payable to Baker Oil Tools, Inc., for the price of the Retainer with four days' time of service man and other ex-

penses amounting to $207; at the same time he signed the service ticket of the Baker Oil Tools, Inc., showing that service was duly rendered.

After A. B. Cannon had reported to E. S. White, he fastened the cement retainer to the circulation joint, which was in turn fastened or screwed to a joint of 2½" "regular" tubing. The retainer and circulation joint and tubing were then let down into the well, as made up, to a depth of 4,932 feet. Testimony was to the effect that it was then necessary to get up at least 600 pounds of pressure of water with the pumps before the retainer could be set, but they failed to get up this pressure and found holes in the joint of pipe above the ground. They removed this joint and then started pumping again and finally secured sufficient pressure to drop the ball in and set the retainer at 4932 feet.

After the retainer was set the Halliburton crew, although not being able to get good pressure, according to a member of the Carter crew, pumped 180 sacks of cement into the well, and when returns started coming up from the outside of the 5½" casing instead of the inside, testimony of various witnesses was to the effect that members of the Halliburton crew and others urged Mr. White to pull the tubing out at once and White stated that he was satisfied with proceedings, disregarded their advice and instructed them to continue with the pumps until all the cement was pumped in. Then water was pumped behind the cement in sufficient amount to clear the tubing of cement. The pumps were then cut off, and a member of Carter's crew let the tubing down about 18 inches until the jars of the circulation joint should be open and all pressure released so they could then turn the 2½" tubing to the right to release it from the retainer. Before the tubing was released, however, Cannon made a mark on the tubing to gauge the distance it would have to be pulled back before the jars closed again. When the tubing was let down and Cannon and members of the Carter crew put tongs on the pipe and turned it to the right to release the tubing from the cement retainer, the swivel stuck and would not turn and the line and block became twisted. It was necessary to place a joint of pipe in the "beak" and fasten the other end against the derrick to hold the swivel and thus avoid twisting up the line, all of which operations delayed the work for a half hour or thereabouts. After

this was done the crew again started turning the tubing to the right by the use of chain tongs. After it had been turned 12 or more times according to Cannon, 11 times according to Moran, a sufficient number of times according to Murphy, and only 9½ times according to Carter and Davidson (the last four being members of the Carter crew), Cannon instructed Murphy to "pull" and Murphy, not being able to pull on number three high gear, switched to third gear low and began pulling, Cannon holding his hand all the time on the pipe or tubing to feel the vibration of the jars closing after a pull of about 18 inches. But when it had been "pulled" about six inches, the pipe separated or pulled apart about 400 feet or 20 joints down, the separation being at the joint.

White stated every effort was made to recover the tubing from the well but only a part of it was ever recovered, although he admitted that he had made no attempt to secure tools from the defendant company which he later learned did have tools with which they could have pulled the tubing from the well. He stated that he spent a large sum of money in an attempt to recover the tubing and found it unprofitable to go to any other expense, and so abandoned the well.

White denied that he had charge of the operations at the time the retainer was being set, stating that he had turned this work completely over to Cannon. He further stated that the pull was sufficient to cause the derrick timbers to creak and the tubing to jump four or five feet when it parted. He testified that Earl Carter and Raymond Davidson of the Carter crew, who were operating the machine, both protested and stated that the tubing had not been rotated sufficiently and that it was then that Cannon stated it had been rotated 9½ times and that 7 times would free it.

Witnesses testified that the 2½" tubing used for setting the retainer and pumping the cement into the well was old, secondhand, rusted, rod-worn and discarded pipe, junked by the Standard Oil Company. It was pipe commonly known as "regular" type and not used even when new for fishing or drilling jobs of this kind, has no shoulder at the threaded ends and, therefore, is much weaker than "up-set" pipe, which has a shoulder at the outside threaded end, thus making the joints, which are usually weakest point of a line of pipe, much stronger. The "up-set" costs little

more and is used for all heavy work. It was shown that the tubing alone—5,000 feet of it—is quite heavy, without considering the unavoidable lack of plumb of the hole, causing extra tension and friction on a pull.

The tubing pulled loose 400 feet down in the well at the threads of a collar, but plaintiff did not offer any evidence as to the particular joint that pulled loose to show just the condition of the pipe-end. According to D. A. Murphy, who operated the machinery: "We didn't pick it up but just a little until the tubing parted, and the machine was at the time in the gear known as 'low gear'."; he also testified that there was no unusual strain on the engine at the time.

The operations necessary in setting the Baker Cement Retainer are shown by the testimony of John Grubb, local representative of Baker Oil Tools, Inc., manufacturer of the retainer, D. A. Murphy and A. B. Cannon. According to these witnesses the retainer is first connected to a circulation joint, which in turn is made up or connected on the first joint of tubing and is then let down into the well, and a ball is dropped into the hole, interrupting the circulation of water being pumped into the tubing; then pressure is raised to 600 pounds, which pressure sets the top slips or expansion joints in the tool. By a slight pick-up of the tubing, the lower slips in the same tool are expanded, the rubber wall of the tool is likewise expanded against the wall of the casing, and the retainer is then set and ready for use. The retainer acts as a plug to stop up the well, and at the same time cement may be pumped through it so that cement can get below the retainer but not above it, unless punctured pipe is used, the idea being not to allow any cement to come between the tubing and casing during the operations. However, in the instant case, when the pumps were getting up pressure in pumping the liquid into the 2½″ tubing prior to the time the cement was pumped in, the crew had a hard time getting up pressure, and it was then found that the top joint was leaking above the ground and this joint was removed; but there was still trouble in getting pressure.

It was admitted that White was using Incor quick-set cement, which, as its name implies, sets very rapidly. As to the tubing used, Morgan said it was the "sorriest" tubing he ever saw used in a well. Mr.

Walter Bershovitz of the Kansas City Pipe & Supply Company, who sold the pipe to White, testified that he advised White against using this old pipe. White admitted holes were found in some of the pipe as large as a lead pencil but said he discarded these. No pressure tests were made to show it would stand any water or cement pressure when down in the hole. Furthermore, there were only 9 or 10 joints left on the rack out of 5,000 feet of tubing, which showed that practically all of it had to be used.

Winn C. Taylor, who sold the tubing for the Standard Oil Company, had misgivings as to its fitness. He said it had been discarded after being rendered unfit for use by sucker rod wear, caused by a constant pumping of the sucker rods up and down in the tubing all day and all night. The pipe wears very thin from rod wear, to quote from him, "whenever it comes in contact with it continuously due to a crooked hole or some other reason", and again: "It wears the pipe thin and gradually cuts it away and it bursts." This inside wear cannot be seen from the outside unless it splits. He further stated that where there is a lot of water to be lifted with the oil, the rod wear is unusually bad and the pipe at times is very badly corroded on account of salt water. Mr. Taylor said that after this pipe is taken out of the wells, they use it for water lines where no pressure is made on it until its gets too rotten for this purpose, and then it is sold to junk dealers. There was some testimony as to the pipe being cut off and re-threaded, but the fact was brought out that there is no way to tell how thick the pipe is under the threads. The pipe was not introduced in evidence to show in just what way it pulled loose.

The testimony of P. A. Liston of the Halliburton crew developed that plaintiff had failed to furnish a pump with which to pump water into the tank, so that the Halliburton crew could direct the entire use of its pump in mixing the cement and pumping it into the hole. Liston stated that this required the disconnecting of their pump from the cement mixing machine, connecting it with the slush pit at the well to pump water in their tank, and then re-connecting with their mixing machine to mix and pump the cement into the well. According to his testimony, no more than five or ten sacks of cement could be mixed at one time.

It was shown by the testimony of Cannon and Moran that there was possibly a half-hour or more delay just when the tubing was to be released, caused by a defective swivel which became stuck and would not turn until a joint of pipe was put in as a brace.

Cannon stated when the bad joint showed up above the ground while water was still being pumped, he advised White to "pull" and get out of the hole and check the tubing. In addition to this, after 180 sacks of the cement or thereabout had been pumped in, and the liquid or returns began to change and show up on the outside of the 5½" casing and stopped returning from the inside of the 5½" casing (and the outside of the tubing), White was advised to pull the pipe out at once, as the returns were showing up wrong. This indicated, according to Mr. Grubb and others, that the cement had begun to set on the inside of the 5½" casing and against the 2½" tubing, thus forcing the pressure or returns to come up on the outside of the 5½" casing, and it was for this reason they were all very much concerned as to the necessity of getting the tubing out at once. On this point, Mr. P. A. Liston testified that he told Mr. White he didn't like the developments; that he thought some of the cement might have got inside, and that they should get loose and get out of the cement and try to pump out the hole, although he was not sure of success; but that Mr. White said "it was acting just like he thought it should." Liston then stated that they continued putting in cement until all of the 200 sacks were in, then they displaced the cement and cut loose from it and it was then that the tubing parted.

As to the number of turns necessary to release the tool, it was shown by physical demonstration made in Court with a similar retainer that the circulating joint could be unscrewed by turning to the right from the retainer in eight and one-quarter complete rounds. Plaintiff had offered in evidence printed instructions of the manufacturer instructing same to be turned 15 times; also a photograph showing 11 threads on the retainer. Mr. John Grubb, local representative of the Baker Tools, Inc., using the Baker Cement Retainer in the courtroom, explained just why only 8 turns were necessary to free the retainer, although there were 11 threads on it, and the book of instructions recommended 15 turns. He said that the threaded end of this joint was cone shaped and in inserting the circulation joint connection it would skip or jump two or more threads so that only 8¼ threads or turns were necessary to make fast the tool. Furthermore, the tool had a flat shoulder which prevented the thread from becoming tight or stuck, which was for the purpose of making it easy to release when down in the well, and that the instructions in the catalogue were given for the benefit of laymen or the purchaser of a tool who did not have a service man from the company who was familiar with its operation as a matter of insurance.

Mr. Grubb also stated that the liner or mandrel of the Baker Cement Retainer was made of cast iron or soft metal so that in case, for any reason, the tool would get stuck, or the joint would not unscrew when a pull was made on any good pipe or tubing, the cast iron mandrel would break long before the tubing would break. This same expert (Grubb) also stated that if the tubing had been turned not quite as many as 8 times, the threads at this joint of the two tools would be separated to some extent on account of its cone shape and the threads would pull loose rather than allow even the mandrel to break. These two features, he said, were stressed by his company to show the safety element in using the particular tool, and that it was almost impossible for the tubing to break in the use of the tool unless there was some trouble with the well or tubing, and which, of course, could be no fault of the tool or of its operation or installation.

Mr. Grubb also stated that he advised E. S. White against using the retainer in the way he intended to use same, but had suggested that he use two retainers, one above the split in the casing and one below, and to cement between the two, which would then concrete the split in the casing. In this way the two retainers could be drilled out along with the concrete, which is done frequently, and he could then make the test at the depth below these locations as he desired; but it appeared that Mr. White thought the way he adopted was better.

On the plea made by defendant that it should not be the defendant in the case, but that the Baker Oil Tools, Inc., should be, Mr. Grubb stated that he had handled the entire transaction for his company, that he had talked to White several times and arranged to furnish him a Baker Ce-

ment Retainer and service man, and that this contract was not made with the Houston Oil Field Material Company but with his own company, Baker Oil Tools, Inc. Mr. T. C. Smith, general superintendent of the fishing tools division of the defendant company, stated that he did not recall White having ever called the Houston Oil Field Material Company and that he never met White until he came to the store in Houston after this work was done. A check was given by White for the retainer to the Baker Oil Tools, Inc., for $207; at the same time White signed a service ticket for the same corporation.

We have come to the conclusion that (a) the action is one in tort and is sufficiently well pleaded; (b) the Houston Oil Field Material Company is the proper defendant, answerable for the tortious actions of its employee or agent; (c) the defendant is not liable.

. (a) As to the action in tort:

The Civil Code of Louisiana, Article 2315, provides that "Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it * * *."

■ ■ Granting that Cannon is the employee and agent of the defendant, which is the holding of the Court further below in this opinion, the defendant company became liable to the plaintiff under the contract for servicing of the Baker Cement Retainer; and also liable for the torts of its agent brought about in the scope of his employment. The Court feels this is well pleaded by the plaintiff in Article 11 of his petition, as follows:

"11. Petitioner shows that the loss of his well was caused solely through the negligence and carelessness of A. B. Cannon, the agent of the defendant corporation, in the following particulars, inter alia, to-wit:

"1. The gross carelessness, negligence and recklessness of A. B. Cannon, the agent and employee of defendant, in failing to rotate the tubing in said well in a proper manner to release same from the tool used in setting the Baker Cement Retainer.

"2. The gross negligence, carelessness and recklessness of A. B. Cannon, the agent and employee of the defendant, in failing to rotate the tubing in said well a sufficient number of times—at least fifteen times, to release same from the tool used in setting the Baker Cement Retainer."

(b) The Houston Oil Field Company is the proper defendant, answerable for the tortious actions of its employee or agent.

■ From the testimony of the numerous witnesses, fully outlined hereinabove, allowing for all factors as to interest and relation, we must find that there was a contract with the plaintiff by the defendant for the servicing of the Baker Cement Retainer. The initial contract relation was established by telephone conversations. The service ticket exhibited and filed is the final evidence of two contracts with the plaintiff: one for the sale of the Baker Cement Retainer tool and parts by the Baker Oil Tools, Inc., at the price of $142.50; one for the servicing of the tool at the well by the Houston Oil Mill Company, the charge being $10 per day for the service man, plus expenses. .

Under the "Terms and Conditions" printed in red on this service ticket, the Baker Oil Tools, Inc., disclaimed responsibility "for damages or losses, direct, indirect, special, consequential, or of any kind whatsoever, occasioned by or incident to the use of Baker Cement Retainers, * * or parts thereof, at the time or at any time subsequent to the use thereof, whether run or operated by customer or by anyone employed directly or indirectly by, Baker Oil Tools, Inc." Since the Baker Oil Tools, Inc., is not sued herein and the tool is not charged by the plaintiff as being inherently defective or not adapted for use as indicated, we must conclude that plaintiff has pitched his case purely and simply on the supposedly neglectful and allegedly grossly careless use of the tool by Mr. Cannon, the employee of the defendant Company. On the service ticket is found stamped very clearly and prominently the words "Serviced by HOMCO".

■ The Court considers that the Houston Oil Field Material Company is a proper defendant herein, answerable in tort. This is legally correct from the pleadings and from the contractual relation proved between plaintiff and defendant, established by oral and documentary evidence.

(c) The defendant is not liable.

■ There are too many contributing factors brought about by the plaintiff, immediately proximate to the breaking of the tubing, and all colored with varying degrees of negligence, which, in the absence of actual proof of negligence on the part

of Cannon, the servicing employee of the defendant, preclude recovery by plaintiff.

We shall summarize these briefly:

First. Mr. Grubb, the local expert in the use of the Baker Cement Retainer tool, advised the agent of the defendant to use two retainers, giving very good reasons therefor, and also indicating the depth that each be placed; this was not heeded by the plaintiff.

Second. At the very beginning of the installation of the tool, when a pressure of 600 pounds was necessary, leaking holes were found in a joint of pipe above-ground. This would indicate strongly bad tubing of this sort from top to bottom of well; indicates it conclusively, when other defects as to tubing are noted hereinbelow.

Third. Returns came from the outside of the 5½" casing instead of the inside, after 180 sacks of cement had been pumped into the well. At this time members of the Halliburton crew and others urged Mr. White, the driller, representative of the plaintiff, the owner of the well—the master of the ship, as it were—to pull the tubing out at once. The agent or representative of the plaintiff did not heed this advice and more quick-setting cement was pumped into the well.

Fourth. When the pipe was first being turned by the use of tongs, the equipment of the defendant proved defective in that the swivel stuck, would not turn, and thus the line and block became twisted. Arrangements had to be made for that and caused unlooked-for delay, which delay allowed the cement to set again more tightly. Later it will be shown, because of location of split in tubing and because of bad tubing, cement went where it should not have gone, and this delay, permitting more quick setting, was fatal.

Fifth. Mr. White, in charge of all operations at the well for the owner, the plaintiff, apparently disregarded all repeated indications, because of bad equipment and defective tubing, that the use of the tool would prove disastrous. This is quite natural and logical, because the equipment and tubing were of such poor character to begin with as to make the whole venture of the drilling of this well a gamble.

Sixth. The tubing used for setting the retainer and pumping the cement into the well was old, second-hand, rod-worn and discarded pipe. It had been sold as "junk" by the Standard Oil Company to the Kansas City Pipe & Supply Company and by the latter sold to plaintiff. A number of witnesses testified that the use of such tubing for such purpose was unknown to the oil-drilling world; that it was extremely hazardous to do so.

Seventh. This pipe even when new would have been unfit for fishing or drilling jobs, such as was involved in this case.

Eighth. The second-hand tubing used herein originally, when made, had no shoulder at the threaded ends, and was, therefore, of the weakest type. A rethreading of the pipe was proved by plaintiff. This rethreading necessarily reduces the thickness, not too thick to begin with in the instant case, and the tensile strength of the pipe is reduced correspondingly. It follows that the mere weight of 5,000 suspended feet could well tear the tubing apart near the top of the well—point of break in the instant case. This should not occur in the case of tubing acceptable for its intended use.

Ninth. The Court was not favored with the extracted joint of pipe where shearing, or break occurred; a presumption against plaintiff, as the possession of it is in plaintiff.

Tenth. The tubing was turned at least eleven times. This is the opinion of the Court after analysis of the varying evidence on this point and also after observation of the demeanor of the witnesses on the stand and after a full consideration given to their interest, attachment to either litigant, etc. Mr. Cannon said he rotated the tube at least twelve times; Moran —eleven times; Carter and Davidson—9½ times; Murphy—a sufficient number of times. The Baker Oil Tools, Inc., in its prospectus says the tubing should be turned 15 times. This was explained by Mr. Grubb, expert for the manufacturer of the tool, as an ultra-cautious requirement for persons setting the tool for the first time and inexperienced in its use. In open court it was demonstrated that the tool cleared in eight turns.

The Court is of the opinion, from a careful consideration of all the evidence, that after turning 10 times or more there is only one test to ascertain if there has been a detachment below. That test is to pull on the tubing to see if it be loose. Because of the ever-present want of plumb of the hole and the ensuing side-rub, because of the ever-present torque dependent on its degree upon how loose or tight

the joints have been screwed together, there is a question of how many turns are lost before the turning at the bottom of the hole begins. In the instant case, however, there were several additional factors, due to the bad tubing and equipment, which entered into the problem of how many turns were necessary. The setting cement seems, in whole or in part, to have gone where it should not have gone; the tubing used had perforations because of rust-rubbed parts. It would seem quite necessary for the service man to have tested by pulling as soon as reasonably possible. This he did. To have turned a greater number of times might have caused the shearing of the bad tubing at any one of the many joints. It might have pulled out when it might not have turned another time, because of the additional troublesome factors of this particular case. The Court is of the unqualified opinion that there would not have been a severance of the tubing except that it was so defective; that a pull at the time made, after 11 turns, was indicated by the facts and circumstances of the case, and was not neglectful.

Eleventh. It is testified by several witnesses that the joints were selected from the lot of second-hand tubing and only the best joints were used. The good effect of this selection is dissipated by the fact that towards the end there were practically no more joints left unused of the lot. There could be no more selection. The nearer the top of the hole, the worse was the tubing. This explains why a joint above ground was found to be perforated and leaking badly and that the break of the tubing occurred near the top of the hole.

There is no allegation that the tool is not a fit one for the purpose for which it was used in this case. We cannot see how the Court could hold the defendant company liable, when its servicing agent is found free of any neglect. Mr. Cannon is proved to have done this work before, and with unvarying success. We believe he went ahead and did the best he could, without neglect, under the permission and general guidance of the plaintiff. There was disaster or, at least, an unsuccessful result. This was brought about by the negligence of the plaintiff in the many ways set out hereinabove.

Plaintiff's case is rejected at his cost.

Judgment will be signed accordingly.